# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ──────────────────────────── ) | |
| MURDER ACCOUNTABILITY ) | |
| PROJECT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 19-2478 (ABJ) |
| ) | |
| U.S. DEPARTMENT ) | |
| OF JUSTICE, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ──────────────────────────── ) | |

## MEMORANDUM OPINION

On April 16, 2019, plaintiff Murder Accountability Project ("MAP") submitted Freedom of Information Act ("FOIA")[1] requests to six agencies: the United States Federal Bureau of Investigation ("FBI"); the National Park Service ("NPS"); the Bureau of Indian Affairs ("BIA"); the United States Army ("Army"); the United States Navy ("Navy"); and the United States Air Force ("Air Force"). Compl. [Dkt. # 1]; *see also* Ex. A. to Compl. [Dkt. # 1-2] ("Plaintiff's FOIA Requests"). It sought data related to crimes investigated by those agencies between January 1, 1989, and the present. Compl. ¶ 18. Citing the agencies' reporting requirements imposed by the Uniform Federal Crime Reporting Act of 1988, 34 U.S.C. § 41303, plaintiff requested all unreported Uniform Crime Report ("UCR") index crime data and Supplementary Homicide Report ("SHR") case summary data, specifically any information on "unreported homicides." *Id.*

On August 15, 2019, plaintiff filed this suit against the FBI, NPS, BIA, Army, Navy, and Air Force, as well as the United States Department of Justice ("DOJ"), United States Department

───────────────────

[1]    5 U.S.C. § 552 *et seq.*

of Defense ("DOD"), the Department of the Interior ("DOI"), and the Defense Manpower Data Center ("DMDC").[2]  Compl. ¶ 1.  The parties have filed cross motions for summary judgment, and the matter is now fully briefed.[3]

## BACKGROUND

### I.   Factual background

The Uniform Federal Crime Reporting Act of 1988 ("UFCRA") went into effect on January 1, 1989.  34 U.S.C. § 41303(g).  It requires that federal law enforcement agencies submit certain crime data to DOJ for reporting and release in the Uniform Crime Report ("UCR") and Supplementary Homicide Report ("SHR").  *Id.* § 41303(c).  Pursuant to the UFCRA, DOJ then reports this data to all "institutions participating in the Uniform Crime Reports program." *Id.* § 41303(c)(3).

Plaintiff MAP is a Virginia non-profit organization that uses algorithms to "identify previously unrecognized serial homicides using . . . homicide data."  Compl. ¶ 8.  As part of its mission, it uses FOIA requests "to educate Americans on the importance of accurately accounting for unsolved homicides in the United States" and to obtain and publish information on the subject

---

2      The Court will refer to defendants Army, Navy, Air Force, DOD, and DMDC collectively as "the military defendants."

3      Defs.' Mem. in Supp. of Mot. for Summ. J. [Dkt. # 28] ("Defs.' Mot."); Decl. of Mark Herrington [Dkt. # 28-1] ("Herrington Decl."); Decl. of Barry Cossey [Dkt. # 28-2] ("Cossey Decl."); Decl. of Michael Seidel [Dkt. # 28-3] ("Seidel Decl."); Decl. of Charis Wilson [Dkt. # 28-4] ("Wilson Decl."); Pl.'s Opp. to Defs.' Mot. [Dkt. # 29]; Pl.'s Cross Mot. for Summ. J. [Dkt. # 30] ("Pl.'s Cross Mot."); Pl.'s Consolidated Mem. in Supp. of Cross Mot. for Summ. J. and Opp. to Defs.' Mot. [Dkt. # 30-1] ("Pl.'s Mem."); Decl. of Thomas Hargrove [Dkt. # 30-2] ("Hargrove Decl."); Decl. of Morgan Wright [Dkt. # 30-13] ("Wright Decl."); Decl. of Ronald G. London [Dkt. # 30-15] ("London Decl."); Defs.' Reply in Supp. of Mot. and Opp. to Pl.'s Cross Mot. [Dkt. # 39] ("Defs.' Reply"); Suppl. Decl. of Charis Wilson [Dkt. # 39-1] ("Suppl. Wilson Decl."); Suppl. Decl. of Barry Cossey [Dkt. # 39-2] ("Suppl. Cossey Decl."); Pl.'s Reply in Supp. of Cross Mot. [Dkt. # 41] ("Pl.'s Cross Reply").

to the general public.  *Id.* ¶ 5.  MAP seeks information about the agencies' compliance with the UFCRA in the three decades since its passage, and its particular focus is whether and how any failure to comply fully may have "thwarted attempts" to determine the existence of important patterns in the murders of Native American women and girls.  *Id.* ¶ 6.

## II.    Procedural history

Plaintiff filed its complaint in August 2019, and beginning in November 2019, defendants began making monthly status reports pursuant to the Court's October 23, 2019 Order.  *See* Min. Order (Oct. 23, 2019).  By February 2020, the military defendants completed their responses, *see* Status Report (Feb. 20, 2020) [Dkt. # 22]; on May 2020, defendants NPS and FBI reported that plaintiff had failed to exhaust its administrative remedies, and defendant BIA indicated that it planned to complete its production immediately.  *See* Status Report (May 4, 2020) [Dkt. # 25] at 1–2.  In the final status report the following month, all defendants reported they had "completed their processing and produced their responsive information," but they "declined to engage in further discussion" with plaintiff.  Status Report (June 19, 2020) [Dkt. # 27].  Shortly thereafter, the Court set a briefing schedule, and the parties filed their respective motions for summary judgment.

On February 5, 2021, after the dispositive motions briefing was completed, plaintiff moved to consolidate this case with another, later-filed case against a narrower set of defendants, *Murder Accountability Project v. FBI* (*"MAP II"*), Case No. 20-cv-3186.  *See* Pl.'s Mot. to Consolidate [Dkt. # 42]; *see also* Defs.' Mem. in Opp. to Mot. to Consolidate [Dkt. # 47].  In light of the motion, the Court ordered plaintiff to address whether the claims against FBI, NPS, and BIA in this case were moot in light of the filing of the subsequent case, *see* Min. Order (Feb. 16, 2021), and plaintiff responded on February 23, 2021.  Pl.'s Resp. to Order to Show Cause [Dkt. # 46].

Upon review of the record and the parties' submissions on the issue, the Court denied plaintiff's motion to consolidate, because the FOIA requests at issue in the two cases were filed on different timetables and sought different documents. *See* Min. Order (Feb. 25, 2021). The parties' cross motions for summary judgment in the original case are now ripe for decision.

## LEGAL STANDARD

In a FOIA case, the district court reviews the agency's decisions *de novo* and "the burden is on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B); *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). "[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Off. of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). When the court is presented with cross-motions for summary judgment, it analyzes the underlying facts and inferences in each party's motion in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

4

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson*, 477 U.S. at 247–48. A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *see also Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In the FOIA context, "the sufficiency of the agency's identification or retrieval procedure" must be "genuinely in issue" in order for summary judgment to be inappropriate. *Weisberg v. DOJ*, 627 F.2d 365, 371 n.54 (D.C. Cir. 1980), citing *Founding Church of Scientology v. NSA*, 610 F.2d 824, 836 (D.C. Cir. 1979) (internal quotation marks omitted).

"Summary judgment may be granted on the basis of agency affidavits" in FOIA cases, when those affidavits "contain reasonable specificity of detail rather than merely conclusory statements," and when "they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013), quoting *Consumer Fed'n of Am. v. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006). A plaintiff cannot rebut the good faith presumption afforded to an agency's supporting affidavits through "purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981).

## ANALYSIS

To prevail in a FOIA action, an agency must first demonstrate that it has made "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). Next, an agency must show that "materials that are withheld . . . fall within a FOIA statutory exemption." *Leadership Conf. on C.R. v. Gonzales*,

404 F. Supp. 2d 246, 252 (D.D.C. 2005).  In 2016, Congress amended FOIA to add an additional requirement:  records that are otherwise protected from disclosure under an exemption must be released unless the agency "reasonably foresees that disclosure would harm an interest protected by an exemption."  5 U.S.C. § 552(a)(8)(A)(i).

## I.    The FBI FOIA request

### a.   Factual background

On April 16, 2019, plaintiff submitted a FOIA request to defendant FBI seeking "all UCR index crimes data and SHR case summary data for crimes investigated by the FBI committed from January 1, 1989 (when the reporting law went into effect) to the present."  Ex. A to Seidel Decl. [Dkt. # 28-3] at 1–2 ("FBI FOIA Request").  Plaintiff specified that it sought records of crimes the agency did not report as required by the UFCRA.  *Id.* at 1.

On the same day that plaintiff submitted its FOIA request, it also sent a letter to FBI Director Christopher Wray, notifying him that it believed the agency was in violation of the UFCRA requirement to collect crime statistics.  *See* Ex. A to Seidel Decl. [Dkt. # 28-3] at 3–4 ("April 2019 Letter to FBI"), citing 34 U.S.C. § 41303.

In response to the April 2019 FOIA request, defendant FBI notified plaintiff on April 23, 2019, that its request qualified for the "unusual circumstances" exception to the twenty-day response requirement under FOIA.  *See* Ex. B to Compl. [Dkt. # 1-3] at 1.  In a May 22, 2019 letter responding to plaintiff's letter, FBI explained that it began submitting UCR summary arrest data in 2015.  Ex. D to Compl. [Dkt. # 1-5] ("May 2019 FBI Letter to Plaintiff").  It added: "[c]oncurrently, the FBI is taking necessary steps to collect and report [National Incident-Based Reporting System ("NIBRS")] data to the UCR Program to ensure compliance with the Uniform

Federal Crimes Reporting Act of 1988," and that it expected to "complete the process by January 1, 2021, [the] NIBRS transition deadline." *Id.*

Plaintiff replied on May 29, 2019; it explained that the first letter sought Director Wray's "assistance in [its FOIA] request to obtain unreported homicide data," and it advised that a lawsuit would be filed in thirty days, in order to allow time to arrange "a meeting with FBI representatives to discuss [its] data requirements" for receiving records responsive to its FOIA request, including plaintiff's preference for particular file types, such as Excel. *See* Ex. D to Seidel Decl. [Dkt. # 28-3] ("May 2019 Letter to FBI"). On June 6, 2019, FBI wrote that it construed plaintiff's letter as a new FOIA request, and it assigned it a new FOIA Request Number ("NFP-108435"). *See* Seidel Decl. ¶¶ 8–9; *see also* Ex. E to Seidel Decl. [Dkt. # 28-3] ("June 2019 FBI Letter to Plaintiff"). The letter continued:

> FOIA does not require federal agencies to answer inquiries, create records, conduct research, or draw conclusions concerning queried data. . . . The questions posed in the referenced letter are not FOIA requests because they do not comply with the FOIA and its regulations. Therefore, your request is being administratively closed.

June 2019 FBI Letter to Plaintiff at 1. The FBI informed plaintiff of its right to appeal the agency's decision within ninety days. *Id.*

The next month, defendant FBI produced two CDs without redactions to plaintiff in response to the initial FOIA request, and it reiterated the procedures regarding administrative appeals. *See* Seidel Decl. ¶ 10; Ex. F to Seidel Decl. [Dkt. # 28-3] ("FBI FOIA Response"). Plaintiff did not appeal the FBI's June 2019 letter or July 2019 production. *See* Seidel Decl. ¶ 12.

### b. Administrative exhaustion

Defendant FBI argues that plaintiff's claims against it should be denied because plaintiff failed to exhaust its administrative remedies in response to the production of the two CDs as

responsive to the initial FOIA request, and to the FBI's decision to construe the June 2019 correspondence as a separate FOIA request which was then denied. Defs.' Mot. at 4–5; *see also* Defs.' Reply at 11–16. Plaintiff counters that FBI has only produced "non-responsive, previously released UCR and SHR data" in response to its FOIA request, and not the homicide reports that were unreported by the FBI during the requisite time period. *See* Pl.'s Cross Reply at 4 n.3. Plaintiff adds that because "summary judgment on exhaustion grounds" for defendant FBI is not supported by the record, its cross motion for summary judgment should be granted, as the FBI has not defended the adequacy of its search for records responsive to plaintiff's request. *See id.* at 4–8.

Defendant FBI is not seeking dismissal of plaintiff's claim for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1); it is not a jurisdictional bar if a plaintiff fails to exhaust any available administrative remedies before bringing a FOIA case in federal court. *See Hidalgo v. FBI*, 344 F.3d 1256, 1259 (D.C. Cir. 2003). But it is also true that generally, "[e]xhaustion of administrative remedies is . . . required before seeking judicial review 'so that the agency has an opportunity to exercise its discretion and expertise on the matter and to make a factual record to support its decision." *Wilbur v. CIA*, 355 F.3d 675, 677 (D.C. Cir. 2004), quoting *Oglesby*, 920 F.2d at 61. And the D.C. Circuit has emphasized that it "favors treating failure to exhaust as a bar to judicial review." *Hidalgo*, 344 F.3d at 1259. There are some circumstances where the Court will excuse failure to exhaust in the context of a FOIA request, such as when dismissal does not serve "the purposes of exhaustion" or "the particular administrative scheme," *Wilbur*, 355 F.3d at 677, quoting *Hidalgo*, 344 F.3d at 1258–59, but those are the exceptions rather than the rule.

Plaintiff does not contest that it did not administratively appeal in this case, so the relevant inquiry is whether dismissal of its claims would be contrary to the purposes embodied in the administrative scheme. The purposes of exhaustion under the FOIA statute are three-fold: (1) to "prevent[] premature interference with agency processes"; (2) to "afford[] the parties and the courts the benefit of the agency's experience and expertise"; and (3) to "compil[e] a record . . . adequate for judicial review." *Miller v. DOJ*, 872 F. Supp. 2d 12, 19 (D.D.C. 2012), quoting *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975).

Here, there is very little record for the Court to review; it consists of the four pieces of correspondence exchanged between plaintiff and FBI in the spring and summer of 2019. Plaintiff complains about the FBI's unwillingness to engage in a dialogue about its compliance with the requirements of UFCRA, *see* Pl.'s Cross Reply at 6–8 (asserting the "FBI's obstructionist approach" has "stymied" its quest for data), but that issue is distinct from the question being litigated: the FBI's compliance with FOIA. Plaintiff opines about the likely availability of responsive data concerning "unreported homicides" in FBI's SENTINEL files.[4] *See* Pl.'s Mem. at 25–27. But plaintiff never addressed the fundamental principle underlying the FBI's denial, that is, whether FOIA requires an agency to compile or create new records, and it chose not to file a timely appeal to air its concerns and generate a record in the manner contemplated by the statute. Under the circumstances, dismissal for failure to exhaust is appropriate. *See, e.g.*, *Freedom Watch, Inc. v. NSA*, 134 F. Supp. 3d 437, 439 (D.D.C. 2015) (dismissing FOIA claim where plaintiff

---

4  SENTINEL is "the FBI's information retrieval system." Wright Decl. ¶ 3. It contains identifying and demographic details about both victims and offenders as well as information concerning the circumstances of, timing, and weapons used in crimes. *Id.* ¶ 5.

admitted it had not appealed agency's response to its FOIA request and thereby had not exhausted its administrative remedies).

In its cross reply, plaintiff discusses the circumstances in *MAP II*, *see* Pl.'s Cross Reply at 7, in which it *did* file a timely administrative appeal of FBI's decision regarding its FOIA request. Plaintiff is apparently frustrated by the agency's response to its appeal, but that is an issue to be addressed in *MAP II*, where, unlike here, there will be a record containing plaintiff's contentions and the agency's rationale to consider. *Id.* at 7–8.

For these reasons, the Court will grant summary judgment in favor of defendant FBI in this case and deny plaintiff's cross motion on its claims against the FBI.

## II. The NPS FOIA request

### a. Factual background

On April 16, 2019, plaintiff submitted a FOIA request to defendant NPS seeking "all UCR index crimes data and SHR case summary data for crimes investigated by the NPS committed from January 1, 1989 (when the reporting law went into effect) to the present." Ex. 1 to Wilson Decl. [Dkt. # 28-4] at 1 ("NPS FOIA Request"). Plaintiff specified that it sought data that the agency failed to report under the UFCRA. *Id.* at 1.

In response, NPS processed one file containing the requested data for the period between 1995–2014, which consisted of a single-page table. Ex. 2 to Wilson Decl. [Dkt. # 28-4] at 1–3 ("May 2019 NPS Letter to Plaintiff"). NPS explained that after conducting a search of its records, no data was found prior to 1995, and data post-dating 2014 was entered into a DOI database maintained by that agency's Office of Law Enforcement and Security ("OLES"). *Id.* at 1. NPS directed plaintiff to submit a request for the data directly to the DOI-OLES FOIA officer. *Id.* It added that plaintiff must file any appeal of the agency's decision within ninety days. *Id.* at 2.

Regarding the unavailable data for the six-year period between 1989 and 1995, the agency

provided the declaration of Charis Wilson, the NPS FOIA officer at DOI, who personally reviewed

and responded to plaintiff's NPS FOIA request.  *See* Wilson Decl. ¶ 1.  The declarant avers:

> I contacted the Associate Director of the Visitor and Resource Protection
> (VRP) directorate and the Deputy Chief of the Law Enforcement, Security,
> and Emergency Services (LESES) division to request information on
> which office . . . would be most likely to have records responsive to the
> request . . . .  [T]he Deputy LESES Chief forwarded my request . . . to the
> NPS Program Manager for the Incident Management Analysis and
> Reporting System (IMARS) . . . [who] advised me that for the period after
> 2014, the National Park Service had no records, as the information for each
> year's [Uniform Crime Report ("UCR")] data call elements had been
> entered directly into a spreadsheet that was managed and maintained by the
> Department of the Interior's [OLES] . . . .  [T]he NPS IMARS program
> manager . . . also confirmed that the spreadsheet [containing NPS UCR data
> from 1995 to 2014] did not have any data for prior years.

Wilson Decl. ¶¶ 3–6.  The declarant continued to look for the missing data:

> [T]he IMARS program manager advised that prior to the implementation of
> IMARS, in 2012–2013, the National Park Service did not have a centralized
> system for managing data or records relating to NPS law enforcement
> activities.  As a result, in order to prepare the UCR report, an annual "data
> call" request would be sent out to each park requesting that year's UCR
> data.  The employee who used to coordinate those data calls and compile
> the NPS UCR data has retired and the files she turned over to the IMARS
> Program Manager were searched but no data prior to 1995 was found.
> Accordingly, the IMARS program manager has no reason to believe that
> NPS has additional responsive records from that time period.  On May 1,
> 2019, the NPS IMARS Program Manager also advised me that he searched
> the UCR data available on the Federal Bureau of Investigation's UCR
> website but did not find any NPS data for the period between 1989 and 1995
> on the site.

*Id.* ¶¶ 7–8.  With this, the declarant compiled and mailed the final NPS response to plaintiff's

FOIA request, and she avers that to the best of her knowledge, no appeal has been filed with the

DOI FOIA Appeals Office and no new request was submitted to the DOI FOIA Officer in the

Office of the Secretary ("OS").  *Id.* ¶¶ 9, 11.

### b. Administrative exhaustion

Defendant NPS argues that summary judgment is appropriate because plaintiff has failed to exhaust its administrative remedies through appeal, but it notes that it "nevertheless processed [p]laintiff's FOIA requests for the data it had." Defs.' Mot. at 5, n.1. Plaintiff again argues that its failure to exhaust available administrative remedies should not be dispositive. *See* Pl.'s Mem. at 22–27.

Here, because defendant NPS processed the request, and the agency has already addressed the adequacy of its response on the merits, it appears that there would be little additional benefit to be derived from further consideration of the matter by the agency. *See Salfi*, 422 U.S. at 765. Therefore, the Court will not dismiss the claim on exhaustion grounds.

### c. Adequacy of the search

Plaintiff moves for summary judgment on the grounds that defendant NPS failed to conduct an adequate search for responsive records, or in the alternative, "withheld responsive records without acknowledging that it did so." Pl.'s Mem. at 23 (capitalizations omitted). In its combined reply and cross opposition, defendant NPS asserts that it has "fully satisfied its obligations under FOIA," Defs.' Reply at 18, and it has provided a supplemental declaration from the NPS FOIA officer, Charis Wilson. *See* Suppl. Wilson. Decl. ¶ 1.

Agencies are required "to make more than perfunctory searches and, indeed, to follow through on obvious leads to discover requested documents." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999). An agency's search for documents in response to a FOIA request is adequate if it is "beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Ancient Coin Collectors Guild v. U.S. Dep't of State*,

641 F.3d 504, 514 (D.C. Cir. 2011), quoting *Valencia-Lucena*, 180 F.3d at 325; *see also Oglesby*, 920 F.2d at 68; *Weisberg v. DOJ*, 705 F.2d 1344, 1351 (D.C. Cir. 1983).

To establish the adequacy of a search, an agency must supply a "reasonably detailed" affidavit which "set[s] forth the search terms and the type of search performed, and aver[s] that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby*, 920 F.2d at 68. "Agency affidavits are accorded a presumption of good faith," *Safecard Servs.*, 926 F.2d at 1200; affidavits may be rebutted "only by showing that the agency's search was not made in good faith,"[5] *Maynard v. CIA*, 986 F.2d 547, 560 (1st Cir. 1993), or if a review of the record raises "substantial doubt" about the sufficiency of the search. *Valencia-Lucena*, 180 F.3d at 326.

The Court finds that NPS has met its burden. NPS's declarant details the procedure she followed and the individuals she contacted in completing plaintiff's request: the Associate Director of the VRP directorate, the Deputy Chief of the LESES division, and the NPS Program Manager for IMARS. *See* Wilson Decl. ¶¶ 3–4. NPS also notified plaintiff that it did not maintain any responsive UCR data for the 2014–2019 period, but forwarded the information to DOI OLES for direct entry into its separately-maintained spreadsheet. *Id.* ¶ 5. It was plaintiff that chose not to follow that lead further.

The agency's declarant also documents her attempts to determine why the data from 1989–1995 was missing from the table ultimately provided to plaintiff. Her explanation is understandably frustrating to plaintiff. But it is also reasonable given the extremely long time period covered by the FOIA request and the myriad improvements in the means that have

---

5        *See also Trans Union LLC v. FTC*, 141 F. Supp. 2d 62, 69 (D.D.C. 2001).

become available for storing and retrieving data since then, and it is afforded a presumption of good faith. *See SafeCard Servs.*, 926 F.2d at 1200. "[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*." *Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (emphasis in original). So while there is an unsatisfying anomaly posed by the missing data prior to 1995, it is clear that the agency's declarant attempted to *find* the information in the agency's files as requested, which is sufficient.

Plaintiff makes much of the fact that the data produced was a one-page summary table that tallied crimes by type, and that NPS did not search its IMARS database for records. But the agency's declarant provides a reasonable explanation for both points:

> Prior to 2012, the NPS did not have a centralized law enforcement database; therefore, an annual "data call" request would be sent out to each park requesting they submit a *tally* of incidents for their parks to be included in the data the NPS submitted to DOI OLES. On behalf of all DOI bureaus, DOI OLES periodically submitted those tallies to the Federal Bureau of Investigation. The annual UCR data calls *only collected and tallied a total count of various incident types*, such as homicides, and the NPS as a Federal agency was not required to prepare or submit supplemental homicide reports. Therefore, the NPS had no records responsive to the portion of the request that seeks "SHR summary case data."

Suppl. Wilson Decl. ¶¶ 4–5 (emphasis added). For information collected after 2013, she explains that NPS used IMARS to track reported criminal activity, but not to maintain the requested UCR or SHR reports, so it was not searched for responsive records. *Id.* ¶¶ 7, 10. And after 2014, NPS was no longer responsible for collecting or reporting UCR information; that responsibility had

passed to DOI OLES, which also did not use IMARS, but rather its own internal spreadsheet. *Id.* ¶ 10.[6]

"[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003). And the D.C. Circuit has stressed that "the agency's failure to turn up a particular document, or mere speculation that as yet uncovered documents might exist, does not undermine the determination that the agency conducted an adequate search for the requested records." *Wilbur*, 355 F.3d at 678. Here, the agency's declarant was able to explain why no more than tallies were produced, as that was the sort of data aggregated into the UCR from NPS. She also outlined why she concluded, after consulting with the NPS Program Manager of IMARS, that a search of its database would not return any additional responsive data.

In light of the agency's detailed declarations regarding its efforts to comply with plaintiff's specific request, the Court finds that NPS conducted a reasonable and adequate search, and it will grant summary judgement in favor of defendant NPS, and deny plaintiff's motion as to that agency.

### III. The BIA FOIA request

#### a. Factual background

On April 16, 2019, plaintiff submitted a FOIA request to defendant BIA seeking "all UCR index crimes data and SHR case summary data for crimes investigated by the BIA committed

---

6     This raises the question of whether defendant NPS should have searched the IMARS database for the 2013–2014 time period, since it was used to collect criminal incidents that could encompass data not reported as required under the UFCRA. However, the agency's declarant clearly articulates that IMARS was not searched because it does not contain UCR- or SHR-specific data, and so the data stored on IMARS it does not fall within the contours of plaintiff's FOIA request.

from January 1, 1989 (when the reporting law went into effect) to the present." Cossey Decl. ¶ 2; *see also* Plaintiff's FOIA Requests at 3. As was the case with other agencies, plaintiff explained that it was specifically seeking data that the agency did not report as required by the UFCRA. *Id.*

Defendant BIA did not respond to plaintiff's April 2019 FOIA request until after this lawsuit was filed in August of 2019. *See* Hargrove Decl. ¶¶ 17–18. Sometime between April and October of 2019, the BIA FOIA Office forwarded plaintiff's request to BIA's Office of Justice Service ("OJS").[7] Cossey Decl. ¶ 3. On October 24, 2019, OJS wrote to plaintiff in an effort to clarify the scope of the request. *See* Notice [Dkt. # 50-2] ("Ex. 2 to Cossey Decl."). It asked whether plaintiff sought (1) "to obtain records the [BIA] did not report to Uniform Crime Report (UCR) and Supplemental Homicide Report (SHR)" or (2) "all UCR index crimes data and SHR care summary data for crimes investigated by the BIA committed from January 1, 1989 . . . to the present." *Id.* at 2. According to the agency's declarant, the OJS FOIA Coordinator did not receive any response from plaintiff, and it applied the second interpretation when it conducted the search for responsive records. Cossey Decl. ¶ 3.

On May 1, 2020, defendant BIA "released 14,950 individual records without redactions, in their original digital format." Cossey Decl. ¶ 7; Suppl. Cossey Decl. ¶ 5. The production included publicly-available data from 2014–2019, and the "reports generally include[d] offender name, age, race, sex, and ethnicity data." Hargrove Decl. ¶ 18.[8] In response, plaintiff requested a meeting with defendant BIA to explain its request and the additional information it believed the

---

7    "OJS is the law enforcement agency for the BIA." Suppl. Cossey Decl. ¶ 1.

8    *See also* Ex. E to Hargrove Decl. [Dkt. # 30-7] ("BIA Production Excerpt").

agency had in its possession, but BIA ultimately declined to discuss these issues with plaintiff after initially agreeing to meet. *See* Correspondence, Ex. A to London Decl. [Dkt. # 30-16].

### b. Administrative exhaustion

Defendants' memorandum in support of their motion for summary judgment includes the heading, "Plaintiff Failed to Exhaust Administrative Remedies for Request to FBI, BIA, NPS," Defs.' Mot. at 4,[9] but it contains no further information about why the motion should be granted as to defendant BIA on that basis. Although defendant BIA provided a declaration from a FOIA processor in the BIA Office of Justice Services ("OJS"), Barry Cossey, *see* Cossey Decl. ¶ 1, it did not direct the Court to any relevant portion of the declaration in support of its position that plaintiff failed to appeal the agency's FOIA production.

In this circuit, "a litigant has an obligation to spell out its arguments squarely and distinctly." *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005), quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (internal quotation marks omitted). "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work." *Consol. Edison Co. of N.Y., Inc. v. FERC*, 510 F.3d 333, 340 (D.C. Cir. 2007), quoting *Schneider*, 412 F.3d at 200 n.1; *see also Davis v. Pension Benefit Guar. Corp.*, 734 F.3d 1161, 1166–67 (D.C. Cir. 2013). Because no substantive exhaustion argument was advanced by defendant BIA, the Court will not take up the issue.

---

9      Nor did defendant BIA supplement its exhaustion argument in the combined reply and cross-opposition or in the supplemental declaration from its FOIA officer, Barry Cossey. This reinforces the conclusion that defendant BIA has forfeited any exhaustion defense.

### c. Adequacy of the search

Plaintiff moves for summary judgment on the grounds that defendant BIA construed its FOIA request too narrowly. *See* Pl.'s Mem. at 15–18. Defendant BIA maintains that it conducted a reasonable search based on the words used in plaintiff's FOIA request.[10] Defs.' Reply at 21.

The agency provides considerable detail about the search in its supplemental declaration. The declarant explains how BIA receives data for the UCR submissions and where it is stored:

> BIA receives crime-related data from each law enforcement program supporting a tribal government across the country. There are approximately 192 such programs. BIA stores the collected monthly UCR submissions in a shared drive, and transmits the monthly UCR submissions directly to the FBI's [Criminal Justice Information System ("CJIS")] office for inclusion in the publicly available national crime statistics. BIA does not maintain any other database or storage location for such crime-related data that it receives from these law enforcement programs supporting tribal governments.

Suppl. Cossey Decl. ¶ 4.

The agency's declarant also describes the search for responsive records, which was limited to the BIA's Office of Justice Services ("OJS") records:

> [I]t was determined that the only records in OJS's possession responsive to the FOIA request were the original UCR report submissions by the law enforcement programs supporting tribal governments. This encompassed all data that BIA had received from the law enforcement programs supporting tribal governments, and thus this is the only responsive crime-related data that BIA maintains. All such files that were reasonably expected to contain the requested records were searched.

Suppl. Cossey Decl. ¶ 5.

---

10      Defendant BIA also maintains that even it had applied the first approach outlined in its request for clarification, "its response would have been the same, as BIA does not maintain any records or recordkeeping system that distinguishes between reported and unreported UCR data." Suppl. Cossey Decl. ¶ 6. Because the Court will remand this claim to the agency to conduct a supplemental search, it need not address this issue. However, since plaintiff failed to respond when it had the chance to do so, it is in no position to argue that BIA made the wrong choice.

But neither defendant BIA nor the declaration of Cossey from OJS addresses why BIA did not produce any records from prior to 2014. *See* Hargrove Decl. ¶ 18 ("BIA . . . produced monthly UCR reports from 2014 through 2019."). Since twenty-five years' worth of requested data is not accounted for, or even discussed, one cannot conclude without more from the agency that the search was adequate. *See* Suppl. Cossey Decl. ¶ 4. The declarant states that "BIA does not maintain any other database or storage location for such crime-related data that it receives from th[o]se law enforcement program supporting tribal governments," *id.*, but that does not answer the question fully.[11]

The Court therefore finds that defendant BIA has not "demonstrate[d] beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents,'" *cf. Ancient Coin Collectors Guild*, 641 F.3d at 514, quoting *Valencia-Lucena*, 180 F.3d at 325, and it will remand the matter to the agency.

---

[11]    Plaintiff points to news articles discussing BIA and FBI investigations into murders of missing Native American women, two of which were written prior to 2014 – in 2008 and 2013. *See* Ex. F to Hargrove Decl. [Dkt. # 30-8]; *see also* Clair Johnson, *Cover up of Murder Brings 15 Year Term*, Billings Gazette (Nov. 20, 2008), https://billingsgazette.com/news/local/cover-up-of-murder-brings-15-year-term/article_5639e782-d48b-5dc3-9f0e-a9dffbcfb7ba.html; Eddie Gregg, *Body of Missing Lame Deer Woman Found; BIA, FBI Investigating*, Billings Gazette (July 9, 2013), https://billingsgazette.com/news/state-and-regional/montana/body-of-missing-lame-deer-woman-found-bia-fbi-investigating/article_e1c7b248-220c-5391-bce3-6fc5846ba602.html; Clair Johnson, *2 Charged with Assault in Burning, Beating of Woman*, Billings Gazette (June 22, 2016), https://billingsgazette.com/news/state-and-regional/crime-and-courts/2-charged-with-assault-in-burning-beating-of-woman/article_2690984b-bfb6-5cd1-bb68-4e6a42aeb513.html. According to plaintiff, these suggest that BIA may possess more information on unreported homicides than it released.

### IV.    The military defendants' FOIA requests

#### a.    Factual background

On April 16, 2019, plaintiff submitted a FOIA request to the Army, Navy, and Air Force, seeking "all [UCR] index crimes data and [SHR] case summary data" for crimes they investigated that were "committed from January 1, 1989 (when the reporting law went into effect) to the present." Herrington Decl. ¶ 3. Plaintiff specified that it was seeking information that the agency did not report under the UFCRA. *See* Plaintiff's FOIA Requests at 5–7.

In response to the April 2019 FOIA request, the three service branches determined that the Defense Manpower Data Center ("DMDC") was the only likely source of responsive records. Herrington Decl. ¶ 5.[12] Defendant DMDC maintains the Defense Incident-Based Reporting System ("DIBRS"), *see* Defs.' Reply at 10, which is the "central repository for the reporting and collecting of criminal incidents by Military members." Herrington Decl. ¶ 6.

The military defendants' declarant explains that "DIBRS is DOD's central and *only* database that is used to provide data to the FBI's NIBRS database, which is a source for the UCR index crimes data requested by Plaintiff." Herrington Decl. ¶ 7 (emphasis added). The DIBRS database includes "identifying demographic information, nature and details of the incident/offense

---

12    Defendant Navy first assigned the request to the Naval Criminal Investigative Services ("NCIS"), and on May 17, 2019, NCIS informed plaintiff that the requested data was maintained by DMDC and referred the FOIA request on May 28, 2019. Herrington Decl. ¶ 4. Defendant Air Force also referred plaintiff's FOIA request to DMDC in May 2019. *Id.* However, the Army took no action before the complaint was filed in this case. *Id.*

The military defendants' declarant is Mark H. Herrington, an Associate Deputy General Counsel in the Office of General Counsel ("OGC") in the United States Department of Defense ("DOD") overseeing FOIA litigation. Herrington Decl. ¶ 1. In light of defendant Army's lack of response by August 2019, he avers that he "conferred with Army and DMDC to confirm that the request to Army should also be processed by DMDC," and he was "informed that was the correct course of action." *Id.* ¶ 4.

to include whether alcohol, drugs and/or weapons were involved; actions taken by military commanders . . .; court-martial results and punishments imposed; confinement information; and limited demographic information pertaining to victims." *Id.* In order to process plaintiff's FOIA requests, DMDC analysts programmed scripts to retrieve data by service branch, and it "segment[ed] that data by the date of the establishment of the database." *Id.* ¶ 8.

On January 31, 2020, the military defendants responded to plaintiff's FOIA request and produced spreadsheets for each service branch pulled from DIBRS. Herrington Decl. ¶ 8; Hargrove Decl. ¶ 21; *see also* Status Report (Feb. 20, 2020) [Dkt. # 22]. The production included "data from over 100,000 incidents," Herrington Decl. ¶ 8, spanning from 2001–2019. *See* Ex. G. to Hargrove Decl. [Dkt. # 30-9] ("Plaintiff-calculated Offense Totals"); *see also* Hargrove Decl. ¶ 25 (explaining plaintiff's spreadsheet was calculated from the military defendants' production of total homicides reported by service branch).

The military defendants' declarant also explained the limits of the production:

> DMDC can only able [sic] to provide data that was within their possession as submitted by the Service Branches. However, given the volume of data provided, and the requirements for completeness and accuracy required under [Department of Defense Initiative ("DODI") 7730.47],[13] any search of individual case files to see if there is additional data available would be unduly burdensome. Assuming searching for individual case files as old as 1989 is even feasible, trying to review each file for data missing from the very system intended to track this information would require countless person-hours and would be unlikely to provide a more accurate and complete data set than what has been located and provided to Plaintiff from DIBRS.

Herrington Decl. ¶ 9.

---

[13] The declarant explained that DODI 7730.47 governs the military defendants' law enforcement agencies' requirements for reporting criminal activity to the FBI, including those imposed by UFCRA. *See* Herrington Decl. ¶ 6.

Finally, the military defendants stated that they withheld some data in the spreadsheet pursuant to Exemption 6, that is, the "offenders' name and social security / alien registration number." Herrington Decl. ¶ 10; *see also* Defs.' Reply at 25–26.

The cross motions for summary judgment raise two main issues: the adequacy of the search and the withholding of personal information pursuant to Exemption 6.

### b. Adequacy of the search

The military defendants claim that their search for responsive records was adequate, and they provided all reportable crime data in their possession, so summary judgment should be granted in their favor. *See* Defs.' Mot. at 5; Herrington Decl. ¶ 9 ("DMDC can only . . . provide data that was within their possession as submitted by the Services Branches."). Plaintiff responds that the search was inadequate because no homicide data was reported for the first twelve years covered by the request when publicly-available data shows that other homicides were investigated by the service branches during this time period. *See* Pl.'s Mem. at 10–11; *see also* Hargrove Decl. ¶ 27; Ex. I to Hargrove Decl. [Dkt. # 30-12] ("Military Death Penalty Cases").

The military defendants have struggled to articulate a reason for this deficiency. First, their declarant states that the sole database searched, DIBRS, is the "only database that is used to provide data to the FBI's NIBRS data," the source for UCR index crimes data. Herrington Decl. ¶ 7. But neither the memoranda nor the declaration explain why, in response to plaintiff's request for data not reported to the UCR or SHR, other databases maintained by the individual service branches should not have been searched for responsive data. There is no explanation for why the request that was initially assigned to NCIS was then referred to DMDC, *see* Herrington Decl. ¶ 4, or why a similar process was followed at the Army and Air Force. The need to search the DMDC DIBRS database in addition is clear, but the military defendants do not explain why that was sufficient on

its own. The military defendants emphasize that they did not use search terms to limit responsive data, but that does not go to the question of which databases were searched. *See Oglesby*, 920 F.2d at 68 (Although there "is no requirement that an agency search every record system," an agency "cannot limit its search to only one record system if there are others that are likely to turn up the information requested.").

Based on these pleadings, the military defendants have not "demonstrate[d] beyond material doubt that [their] search was 'reasonably calculated to uncover all relevant documents,'" *Ancient Coin*, 641 F.3d at 514, quoting *Valencia-Lucena*, 180 F.3d at 325, and plaintiff has pointed to some limited evidence in the record that raises doubts about their efforts. Therefore, the Court will deny the military defendants' motion for summary judgment at this time and will deny plaintiff's cross motion as moot.

### c. Withholdings pursuant to Exemption 6

Plaintiff also argues that the military defendants improperly redacted the records they did produce under Exemption 6. Exemption 6 allows withholding of "personnel and medical files and similar files" – the disclosure of which "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The primary purpose of Exemption 6 is "to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 599 (1982). Such a determination is made by "weigh[ing] the privacy interest in non-disclosure against the public interest in the release of records in order to determine whether, on balance, the disclosure would work a clearly unwarranted invasion of personal privacy." *Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999) (internal quotation marks and citation omitted).

The first step involved in the balancing test is whether there is an individual privacy interest in the material withheld. *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989). The Supreme Court has recognized that "the concept of personal privacy . . . is not some limited or cramped notion," *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 165 (2004) (internal quotation marks and citation omitted), but rather, "privacy encompass[es] the individual's control of information concerning his or her person." *DOJ v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989). FOIA's privacy exemptions were "intended to cover detailed Government records on an individual which can be identified as applying to that individual." *Wash. Post Co.*, 456 U.S. at 602 (internal quotation marks and citation omitted).

In order to qualify for protection under Exemption 6, the information need not be intimate or embarrassing. *Horowitz v. Peace Corps*, 428 F.3d 271, 279 (D.C. Cir. 2005). In general, personal identifying information such as an individual's name, address, phone number, date of birth, criminal history, medical history, and social security number may be protected under the exemption. *Wash. Post Co.*, 456 U.S. at 600; *see also Horner*, 879 F.2d at 875.

Only three types of information were redacted from the records the military defendants released to plaintiff:[14] offenders' names, social security numbers, and alien registration numbers. As the Court has already explained, these categories of information are exactly the kind of personal identifying information that may be protected from disclosure under Exemption 6. Furthermore, plaintiff is not interested in receiving this information. Pl.'s Mem. at 12 n.5 ("MAP does not seek [the release of social security and alien registration numbers], and does not object to its redaction."); *see also id.* at 14 ("MAP does *not* seek offender names[.]") (emphasis in original). The Court therefore concludes that the redaction of this information from the military defendants' production is reasonable under circuit precedent concerning Exemption 6, and it will grant summary judgment to the military defendants on this issue.

## CONCLUSION

For these reasons, the Court will grant in part and deny in part defendants' motion for summary judgment, and it will deny plaintiff's cross-motion for summary judgment as moot. Summary judgment will be granted in favor of defendants FBI, DOJ, and NPS, and plaintiff's cross motion as to those defendants will be denied. The motions for summary judgment in favor of defendants BIA, DOI, Army, Navy, Air Force, DMDC, and DOD will be denied without

---

14      Plaintiff also argues that the military defendants "omitted" offenders' demographic data from their production. *See* Pl.'s Mem. at 13. Plaintiff bases this conclusion on the data reported by BIA, which included offenders' age, race, sex, and ethnicity. *See id.* at 12–13.

In the January 2020 production, the military defendants released spreadsheets comprised of service-branch data pulled from DIBRS, and the redacted portions, as discussed *supra*, included offenders' names, social security number, and alien registration numbers. Herrington Decl. ¶¶ 7–8, 10. Although plaintiff objects to the lack of demographic data provided, there is no evidence that such data was improperly withheld from disclosure by the military defendants. Nor does evidence of BIA collecting and reporting such data shed any light on what information is maintained in DMDC's DIBRS database.

prejudice at this time, and plaintiff's motion with respect to those defendants will be denied as moot without prejudice to their renewal after defendants' supplemental submissions.  The case will be remanded to defendants BIA, DOI, Army, Navy, Air Force, DMDC, and DOD for further consideration of plaintiff's requests in accordance with this opinion, and the Court will call for a status report in ninety days.

A separate order will issue.


AMY BERMAN JACKSON
United States District Judge


DATE: June 30, 2021